UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
COPAPE PRODUTOS DE PÉTROLEO LTDA.,

                Plaintiff,

       -against-                            11 Civ. 5744 (LAK)

GLENCORE LTD.,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

          Appearances:

                    Peter R. Chaffetz
                    David M. Lindsey
                    Matthew E. Draper
                    CHAFFETZ LINDSEY LLP
                    *Attorneys for Plaintiff*

                    Eliot Lauer
                    Jason Gottlieb
                    Ellen Tobin
                    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
                    *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff Copape Produtos de Pétroleo Ltda. ("Copape") entered into a contract with

defendant Glencore Ltd. ("Glencore") to purchase approximately 150,000 cubic meters of light

reformate, a substance used in blending gasoline.  The parties had a falling out in consequence of which

Copape commenced litigation against Glencore in Brazil while Glencore demanded arbitration in New

York.  The matter is before the Court on Copape's motion for a preliminary injunction staying the

arbitration on the ground that there is no relevant agreement to arbitrate and on Glencore's cross-motion

to compel arbitration.  The motions depend upon the disputed existence of an agreement to arbitrate this

dispute, which Copape contends implicates a battle of the forms, or something much akin to it, arising

from the parties' negotiation of the agreement.


*Facts*

*The Commencement of the Relationship*

The commercial relationship between the parties began around December 2009 when

Copape approached Bruno Faro, a Glencore affiliate in Brazil, in an effort to develop business.[1]  This

led to meetings in early 2010 between two Copape representatives, Messrs. Lima and Mezzarano, with

Glencore personnel in London and Phoenix.[2]

These early contacts led, in the period between January and April 2010, to five contracts

for the purchase of light reformate or other related products.[3]  Each of the first four contracts was

negotiated in a similar manner.  First, Faro discussed proposed sale and delivery terms with Copape by

phone or e-mail, in each case following up with an e-mail containing Glencore's primary commercial

---

[1]
       Faro Decl. ¶ 8.

[2]
       *Id.* ¶ 9.

[3]
       *Id.* ¶ 14 & Ex. 1.

terms and stating that additional terms would be included in Glencore's formal contract.[4] That initial e-mail always included the statement "[o]ther terms and conditions as per Glencore standard CFR contract" or "[o]ther terms and conditions as per Glencore standard DES contract."[5]

Copape then responded by e-mail, either agreeing to Glencore's proposal or providing counter-proposals for certain terms. The parties resolved open points via telephone and e-mail exchanges.[6]

Once agreement was reached on the commercial terms, Glencore representatives (1) issued the invoice for the first payment (typically 10 to 20 percent of the total provisional value of the cargo), which Copape typically paid within 1 or 2 days, and (2) drafted the formal contract governing the transaction, which contained the primary commercial terms that had been agreed upon as well as other provisions.[7] Glencore then sent the finalized formal contract – the document to which the terms "CFR contract" or "DES contract" referred – to Copape "confirming the parties agreement for the sale of" the product.[8] Each of these contracts contained the following clause:

---

[4] *Id.* ¶ 12.

[5] *Id.*

"CFR" and "DES" are terms defining the point at which the seller delivers the goods to the buyer. *See id.* ¶ 13 & Ex. 2. They are standard "Incoterms" issued by the International Chamber of Commerce, and are designed to provide standard international shipping rules for contracts involving foreign trade. *Id.*

[6] *Id.* ¶ 14.

[7] *Id.* ¶ 15.

[8] *Id.* ¶¶ 17-18, 24, 38.

"As Glencore is the selling party in this transaction, and as per standard industry practices, Glencore's contract *along with Glencore Ltd's general terms and conditions* dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction."[9]

There is no evidence that Copape ever objected to the terms of any of the formal contracts relating to the four initial transactions.  But it is relevant to point out that the arbitration clause upon which Glencore relies was not in the formal contracts.  It appeared instead in the general terms and conditions ("GTC").[10]  Glencore never sent the GTC to Copape.[11]  Nor did Copape ever ask for them.[12]  In any case, it is undisputed that there was no mention of arbitration in any of the parties' discussions.[13]

*The Contract At Issue*

On April 8, 2010, Glencore initiated discussion regarding a fifth contract when it e-mailed Copape an "indication" for three 50,000 cubic meter shipments of light reformate.  The e-mail set forth the principal proposed terms and ended with the line "Other terms and conditions as per

---

[9]

*Id.* ¶ 19 & Ex. 1 (§ 11) (emphasis added).

[10]

It provided: "[A]ny claim or controversy arising out of, or relating to this contract or breach thereof shall be settled by arbitration, and subject to the rules of the American Arbitration Association, in the City of New York, by a panel of three arbitrators, one chose by each party and the third nominated by the two arbitrators so chosen."  *Id.* & Ex. 3.

[11]

Mezzarano Decl. ¶ 7.

[12]

*See id.* ¶¶ 7, 10, 11; Faro Decl. ¶ 20.

[13]

*See* Faro Decl. ¶ 46; Mezzarano Decl. ¶¶ 10, 13.

Glencore standard DES contract."[14]

Copape responded four days later by e-mail with a counter proposal styled "BID for Light Reformate."  Mr. Mezzarano pasted the text of Glencore's April 8 e-mail into the bid, but altered several key terms.  Moreover, he changed the final sentence to read "Other terms and conditions as per Glencore standard DES contract, *witch* [sic] *must be approved by Buyer* [Copape]."[15] According to Mr. Mezzarano, he "added those words to make clear that Copape would not agree to any conditions it had not had the opportunity to consider and accept or reject."[16]

Later on April 12, Glencore responded with an e-mail setting forth "the terms and conditions we agreed upon."[17]  So far as is relevant here, Glencore's e-mail specifically adopted the language from Copape's earlier e-mail:  "Other terms and conditions as per Glencore standard DES contract, witch [*sic*] must be approved by Buyer."  An hour later, Copape responded by e-mail, confirming the deal and requesting invoices in order to proceed accordingly.[18]  Invoices were issued immediately, and Copape arranged for payment of the full amount, more than $9 million, on the same day.[19]

Subsequent negotiations then ensued.  On April 14, 2010, Copape requested, and

---

[14]   Mezzarano Decl. ¶ 7 & Ex. 1, at 2-4

[15]   *Id.* ¶ 8 & Ex. 2, at 2 (emphasis added).

[16]   *Id.* ¶ 8

[17]   *Id.* ¶ 9 & Ex. 3.

[18]   Faro Decl. ¶ 30 & Ex. 9.

[19]   *Id.* ¶ 31.

Glencore soon agreed to, postponement of the three deliveries of light reformate.[20]  These changes were reflected in an April 16, 2010 e-mail from Glencore, which contained the additional statement that "[a]ll other terms and conditions remain[ed] unchanged."[21]  In addition, some days later, a difference of view arose with respect to the aromatics specification in the contract, which the parties ultimately worked out.[22]

On April 27, Glencore sent Copape an email stating that it had made adjustments to certain product specifications pursuant to recent negotiations and that "attached is [a] copy of our contract with the amended specification."  This April 27 email was the first and only time that the standard DES contract that Copape had earlier insisted "must be approved" by it was transmitted.[23]

The cover sheet of the DES Contract stated that the contract "confirm[ed] the agreement negotiated on Apr 12, 2010."[24]  This document, however, contained two material terms that had been

---

[20]   *Id.* ¶ 32 & Ex. 12.

[21]   Faro Decl. ¶ 34.

[22]   *Id.* ¶¶ 37-38

[23]   There is some confusion as to the date or dates that the standard DES contract was sent and received and as to whether multiple versions of the formal written contract ever were transmitted.  Copape asserts that "On April 13, 2010, Mr. Faro sent Copape Produtos de Petroleo Ltda. a  letter," and attaches a version of the DES contract dated April 13, 2010 as a true and correct copy of that letter.  *See* Mezzarano Decl. ¶ 10 & Ex. 4.   Glencore, however, clarifies that while the contract was dated April 13, 2010, it was not transmitted until April 27, when it was sent with an email of that same date.  *See* Faro Decl. ¶ 38 & Ex. 14.  As the copies of the formal contract provided by each party are identical, and Glencore's understanding of the timing of the transmission coincides best with the record as it otherwise stands, the Court adopts Glencore's understanding of events.  The formal contract transmitted on April 27 will be referred to hereinafter as the "DES Contract."

[24]   Mezzarano Decl.  ¶ 10 & Ex. 4.

revised post-April 12 – the aromatics specification and the delivery dates.[25]   It contained some additional terms that had not been in the April 12 e-mail, as well as the GTC provision.[26] This appeared in Section 11 of the contract and read as follows:

> "As Glencore is the selling party in this transaction, and as per standard industry practices, Glencore's contract along with Glencore Ltd's general terms and conditions dated October 2005 with amendments made in July 2008 and July 2009 shall govern the terms of this transaction.  If any of the above is contrary to your understanding of our agreement, please respond immediately by fax with your specific points of disagreement (not a full contract) to seller's fax number indicated on this contract. Glencore Ltd. will not accept any notices sent to any other number and will not be responsible for any costs or liabilities resulting therefrom.  In the event no such notification is received by the close of business on the next working day following the date of this contract, the provisions set forth in Glencore's contract shall be binding upon both parties without modification or substitution."[27]

Glencore did not provide Copape with the GTC there referred to.  Copape never asked for them.[28]

*The Subsequent Negotiations*

Copape promptly responded by email, stating that it did not accept the aromotatics specification listed in the DES Contract but failing to raise any question regarding the GTC provision

---

25

*Id.* ¶ 40.

26

*See* Mezzarano Decl. Ex. 4; Faro Decl. Ex. 14.

27

*Id.* ¶ 10 & Ex. 4, § 11.

28

*See* Faro Decl. ¶ 20 & Ex. 4.  Glencore alleges that it sent Copape a copy of the formal DES contract when the negotiations took place for the parties' first contract in January 2010.  That contract contained the same § 11 incorporating the GTC as the contract currently at issue. Mr. Souza Lima, a Copape employee, informed Mr. Faro that he had sent the contract on to Copape's legal department and that he would "get back to [him] about this contract as soon as possible."  Copape never notified Glencore of any objection to that contract.  Nor did not ask to see the GTC.

or to request any information about the GTC.[29]   After further negotiations, the parties agreed upon revised quality, price, and volume terms.  Glencore's final e-mail regarding negotiation of this contract, dated May 6, 2010, contained the statement "Other terms and conditions remain unchanged" to which Copape responded "OK."[30]

*Subsequent Events*

In time, Copape allegedly breached the contract.  Copape sued Glencore in the 28th Civil Court of Rio de Janeiro, Brazil, on October 28, 2010.  On June 25, 2011, Glencore commenced arbitration before a division of the American Arbitration Association.  Copape then brought this action to stay the arbitration, and Glencore later moved to compel arbitration.

*Discussion*

Despite the parties' sometimes confusing nomenclature, the motions before the Court turn entirely on a single question – whether Copape ever became bound by the arbitration clause included in Glencore's GTC, terms and conditions which were referred to (without any mention of arbitration) in Section 11 of the formal contract that Glencore sent to Copape upon conclusion of the 150 cubic meter light reformate contract on April 27, 2010, following the renegotiation of certain of the terms of that contract.  As it is undisputed that the parties' dispute comes within the arbitration clause if Copape became bound, Copape's motion to stay the arbitration[31] in that event must be denied and

---

[29]   Mezzarano Decl. ¶¶ 43-44.

[30]   *Id.* ¶¶ 45-47 & Ex. 17.

[31]   It refers to its motion as one for a preliminary injunction but there is nothing preliminary about the relief it seeks.  It seeks an order determining that there is no agreement to

Glencore's motion to compel arbitration granted. On the other hand, if Copape did not become bound, then it would be entitled to a stay of the arbitration, and Glencore's motion to compel it to arbitrate would have to be denied.[32]

*The Parties' Positions*

    *Copape*

        Copape's argument that it is not bound starts and ends with the April 12, 2010 negotiations regarding the contract, which was formed by two or perhaps three e-mails:

- Copape's April 12, 2010 e-mail, which set forth the terms of its bid, restated other terms previously proposed by Glencore, and changed the last line to read "Other terms and conditions as per Glencore standard DES contract, witch [*sic*] must be approved by Buyer."

- Glencore's April 12, 2010 response, which in substance accepted the bid and also explicitly adopted Copape's language, "Other terms and conditions as per Glencore standard DES contract, witch [*sic*] must be approved by Buyer."

- Copape's subsequent April 12, 2010 e-mail confirming the deal and requesting invoices.

None of these e-mails said anything about arbitration. None, in Copape's view, agreed to or approved "other terms and conditions as per Glencore standard DES contract," let alone the arbitration clause

---

arbitrate. *See generally Manning v. Energy Conversion Devices, Inc.,* 833 F.2d 1096, 1100-101 (2d Cir. 1987).

[32]

    It is undisputed also that this case falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (June 10, 1958), and that the Court has subject matter jurisdiction under 9 U.S.C. § 203.

contained in the GTC, which Copape says it never had even seen nor discussed.  Under either the "mirror image rule," which Copape contends is the governing principle, or the Uniform Commercial Code, it asserts that it is not bound to arbitrate this dispute.[33]

*Glencore*

Glencore, not surprisingly, takes a much different view.  It maintains first and foremost that Copape agreed to arbitrate when it objected only to certain non-arbitration terms in the DES Contract on April 27, 2010, thereby failing to object to the GTC, and then again when it approved the deal in its entirety on May 6, 2010, without objecting to the GTC or the arbitration provision.[34]  It argues also that such a conclusion is warranted by the (asserted) fact that the parties' course of dealing earlier in 2010 had included arbitration clauses[35] and that Copape's earlier reservation, whereby it had to approve the DES contract, was insufficient to prevent it from being bound by the arbitration provision.[36]

---

[33]

The enforceability of an arbitration agreement is governed by the federal law of arbitrability, "which comprises generally accepted principles of contract law," including the Uniform Commercial Code.  *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 &  n.4 (2d Cir. 1987).  Copape argues first and foremost that the applicable standard under federal common law is the "mirror image rule" rather than UCC § 2-207. This is incorrect.  The mirror image rule long has been disregarded in favor of § 2-207 in contracts such as this one between merchants for the sale of goods.  *E.g,. Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1174 (7th Cir. 1994) (noting that the common law "mirror image" rule has been "jettisoned" by UCC. § 2-207); *accord Litton Microwave Cooking Prods. v. Leviton Mfg. Co., Inc.*, 15 F.3d 790, 794 (8th Cir. 1994); *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443 (9th Cir. 1986).  In any case, there is no reason to conclude that any principle of federal common law would alter the result in this opinion.

[34]

Glencore Mem. at 15.

[35]

*Id.* 18-19.

[36]

*Id.* 19-20.

*The Contract as Initially Concluded*

It is helpful to begin with the legal effect of the arrangements the parties made in the inception of the 150,000 cubic meter light reformate contract, as these shed light on Glencore's contentions.

"[A]rbitration is a matter of consent, not coercion."[37]  In consequence, "[b]efore a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it ever entered into an agreement which obliges it to consent to arbitration."[38]  Moreover, "to enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present."[39]

Here, the discussions concerning the contract at issue began on or about April 8, 2010 with Glencore's "indication" for three shipments of light reformate.  The "indication" stated "[o]ther terms and conditions as per Glencore standard DES contract."  But Copape did not accept that "indication."  Rather, on April 12, 2010, it made its own bid, altering several of the business terms proposed in the "indication" and, importantly, changing Glencore's proposed final term to read "[o]ther terms as per Glencore standard DES contract, *witch* [sic] *must be approved by Buyer."*  Glencore later that day adopted that term, immediately following which Copape confirmed the deal by e-mail, requested the issuance of invoices and, upon their receipt, arranged to pay $9 million.

If that were the whole story, the case would be entirely straightforward.  Copape's April

---

[37]

    *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.,* 130 S.Ct. 1758, 1773 (2010) (quotation marks and citations omitted).

[38]

    *PMC, Inc. v. Atomergic Chemetals Corp.,* 844 F. Supp. 177, 181 (S.D.N.Y. 1994).

[39]

    *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.,* 643 F.2d 863, 868 (1st Cir. 1981).

12 response to Glencore's "indication" rejected Glencore's proposal that all terms other than those set forth in the e-mailed term sheets would be as set forth in Glencore's standard contract. Instead, the response rejected the standard contract terms, except to whatever extent Copape later might approve them. Glencore then adopted this understanding. For the purposes of determining the terms included in this contract as of April 12, 2010, Copape had not approved of Section 11 of the standard Glencore DES contract or, more to the point, the GTC to which it referred. But there is more to this case than that, and the broader context ultimately leads to a different result.

Copape relies on the "battle of forms" provision of the Uniform Commercial Code ("UCC"), Section 2-207, which provides in relevant part as follows:

> "(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> "(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> > (a) the offer expressly limits acceptance to the terms of the offer;

> > (b) they materially alter it; or

> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

In Copape's view, the April 12 discussions encompassed the terms of the contract. Copape argues that the formal DES Contract, sent on April 27, was a "written confirmation" of those terms, "even though it state[d] terms additional to . . . those [previously] agreed upon,"[40] including the arbitration provision incorporated by reference in Section 11. The additional terms therefore are

---

[40] Pl. Mem. at 12.

"construed as proposals for addition to the contract."[41]  As it is undisputed that both Copape and Glencore are merchants, under this view the additional terms, including the GTC and the arbitration clause, became part of the contract after the April 27 "written confirmation" unless one of the three conditions set forth in Section 2-207(2) was satisfied.

*Express Limitation and Notification*

Copape first argues that Sections 2-207(2)(a) and (c) were satisfied because the inclusion in its April 12 bid of the clause "[o]ther terms as per Glencore standard DES contract, witch [sic] must be approved by Buyer" both expressly limited acceptance to the offer  and served as notice of its objection to any unapproved terms in the DES Contract.  But the argument is not persuasive.

It is true that Copape on April 12 expressly reserved the right to "approve" any of the terms of the DES Contract not previously agreed upon by the parties.  Until Copape received the DES Contract, the "other terms and conditions" were not incorporated into the contract. When Copape received the DES Contract, however, it was became aware of  its contents in their entirety.[42]   This included Section 11, which stated that the parties would be bound by the GTC and that Copape had until the "close of business on the next working day following the date of this contract" to provide Glencore

---

41

       This is true of the GTC, as the parties were "free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements."  *Aceros Prefabricados, S.A. v. Tradearbed, Inc.,* 282 F.3d 92, 97 (2d Cir. 2002) (quoting *Ronan Assocs. v. Local 94-94A-94B, Int'l  Union of Operating Eng'rs,* 24 F.3d 447, 449 (2d Cir. 1994) (internal quotation marks omitted)).  Certainly there is no reason to suppose that a copy of the GTC was not available to Copape for the asking.

42

       It is irrelevant whether Copape actually reviewed the DES Contract.  Parties are presumed to know the contents of contracts that they agree to, regardless of whether they actually are aware of their particular terms.  *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004); *K.K.D. Imps., Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition*, 36 F. Supp. 3d 200, 203 (S.D.N.Y. 1999).

14

with any objections it had to Section 11.

Copape did not raise any issues with respect to Section 11, the GTC, or the arbitration provision at any time after receiving the DES Contract. Instead, Copape wrote back promptly, objecting to certain *other* terms in the DES Contract.[43] Additional changes to the terms of the agreement resulted, and on May 6 Glencore sent an email with the final quantities, price, and volume terms of the contract. It noted that "[O]ther terms and conditions remain unchanged," and asked Copape "reconfirm by return."[44] Copape did so by simply replying "OK."[45]

If Copape had had any objections to Section 11, the GTC, or the arbitration provision, the appropriate course of action to ensure that such objections were duly considered would have been to reply by fax within one business day of April 27 – as required by the DES Contract. Copape may have reserved the right to "approve" the additional terms of the DES Contract, but it did exactly that when it failed to object to Section 11. Absent such an objection, the arbitration clause was incorporated into the contract.[46] Compounding matters, Copape approved the provision again, when, after it had received the DES Contract, it re-confirmed that all "other terms and conditions" (which at this point included the GTC) were "OK." Taken together, Copape's failure to object followed by its explicit

---

[43]
      Faro Decl. ¶ 45.

[44]
      *Id.* ¶ 47.

[45]
      *Id.*

[46]
      *See Colorado-Arkansas-Texas Distrib., LLC v. Amer. Eagle Food Prods., Inc.*, 525 F. Supp. 2d 428, 432 (S.D.N.Y. 2007); *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 789 F. Supp, 1229, 1240 (S.D.N.Y. 1992). Moreover, the previous four contracts between the parties contained terms identical to Section 11 in the contract at issue. Past tacit acceptance of a contract term indicates acceptance of that same term in a later contract where a party does not make an explicit objection. *See New Moon Shipping Co. Ltd. v. MAN B&W Diesesl AG*, 121 F.3d 24, 31 (2d Cir. 1997).

acceptance of the contract's terms show that it neither "expressly limit[ed]" its acceptance of the contract to the April 12 terms nor "notif[ied]" Glencore of any objection to Section 11, the GTC, or the arbitration provision.

These facts alone would be sufficient to find that Copape's April 12 requirement that it must approve the additional terms provided by the standard DES contract did not relieve it of the duty to arbitrate. But this outcome is further supported by the additional alterations to the contract that took place after April 12. From that date until May 6, when the contract was finalized, ongoing negotiations occurred regarding the price, product specification, and timing under the contract. Copape initiated these modifications when it requested, on April 14, that the product shipment dates be altered. Further material modifications were made, and the new terms of the agreement were formalized in the DES Contract sent to Copape on April 27. One last round of negotiations regarding certain product specifications then took place, and on May 6 the parties reached a final agreement.

On closer examination, then, this case is not one involving a "battle of the forms" at all. Rather, it is a textbook example of basic contract negotiation. Copape's April 12 statement that additional terms set forth under the DES Contract "must be approved" by it was an early condition in an ongoing process of negotiation before a final contract was formed on May 6, 2010. The April 27 DES Contract contained several provisions that had been altered after the April 12 discussions – some of them at Copape's request. The DES Contract was not a "written acceptance" of a contract the parties had otherwise agreed to on April 12. It was a revised offer that reflected new terms and conditions pursuant to ongoing negotiations. Those terms and conditions – including the GTC – were subsequently accepted by both parties. Accordingly, Copape is bound by the arbitration provision.

*Materiality*

Copape argues also that the arbitration provision was an "additional term" in the April 27 "written confirmation" that would materially, and therefore impermissibly, alter the contract under UCC § 2-207(2)(b).  As noted above, however, the arbitration provision was not an "additional" term that was added to a later  "written acceptance" of the April 12 agreement.  Rather, it was one term among many that the parties agreed upon in due course, while negotiating and finalizing the contract.  Any consideration of "materiality" under Section 2-207 is therefore irrelevant for present purposes. Copape approved the arbitration provision, and it is now bound by its terms.

*Conclusion*

For the foregoing reasons, Copape's motion for a preliminary injunction [DI 9] is denied, and Glencore's motion to compel arbitration [DI 18] is granted.

SO ORDERED

Date:          February 8, 2012


_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)